Martinique, Petitioner *v.* Commonwealth of Pennsylvania, Workmen's Compensation Appeal Board and Julie Girardi, Respondents.

Argued March 8, 1979, before Judges CRUMLISH, JR., BLATT and CRAIG, sitting as a panel of three.

*Thomas R. Bond,* with him, of counsel, *LaBrum and Doak,* for petitioner.

*Gerald J. Haas,* for respondents.

OPINION BY JUDGE CRAIG, August 13, 1979:

This is an appeal by Martinique (employer) from an order of the Workmen's Compensation Appeal Board (Board) affirming the referee's award of benefits on a fatal claim petition filed by Julie Girardi (claimant) for the death of her husband, Philip Girardi. We affirm the Board.

Philip Girardi was a waiter for the employer at a New Year's Eve banquet on December 31, 1972. His duties that evening included setting up his tables, circulating among the guests carrying a heavy tray of hors d'oeuvres, putting out two heavy ice buckets, serving drinks to his assigned tables, serving dinner to about 25 people, and clearing the tables of dishes and carrying them to the kitchen. Some time before midnight, after serving the meal, claimant collapsed while getting a round of drinks from the bar. He was taken by ambulance to the hospital, where he died a short time later.

Claimant, his widow, filed a fatal claim petition against the employer on June 6, 1973. After a hear-

ing, the referee granted her compensation. The employer appealed to the Board, which affirmed the referee's award. This appeal followed.

The employer's sole claim on this appeal is that claimant has not met her burden of proof regarding the medical causation of her husband's death.

In a fatal claim petition, claimant has the burden of showing that the decedent suffered an injury which both arose in and was related to the course of his employment. *Royesky v. Workmen's Compensation Appeal Board*, 34 Pa. Commonwealth Ct. 274, 383 A.2d 566 (1978). Where, as here, the injury was not obviously caused by the decedent's employment, claimant has the burden of producing unequivocal medical evidence to establish such a causal relationship. *Royesky, supra.*

Claimant has met that burden.

Although the decedent had a pre-existing coronary artery disease, for which he was receiving treatment, and a history of heart attacks, his attending physician, Dr. Steinberg, testified that in his opinion the decedent had died of a heart attack which both arose in and was related to his course of employment.

However, the employer, to argue that Dr. Steinberg's testimony was not unequivocal, isolates a single portion of Dr. Steinberg's testimony. On direct examination, after claimant's counsel recited a long list of the decedent's duties at his employment, the following exchange occurred between claimant's counsel and Dr. Steinberg:

Q: Now, Dr. Steinberg, assuming the correctness of the facts that I have given to you, plus your own personal examination and treatment of Mr. Girardi and ignoring anything that your son may have done or seen or written and your knowledge of his history and previous hospitalization, do you have an opinion

within a reasonable degree of medical certainty as to whether there is a relationship between Mr. Girardi's death on December 31, 1972 and the work he was doing at the Martinique on that particular day?

. . . .

THE WITNESS: I have an opinion.

Q: What is that opinion, sir?

A: The opinion is that the exertion to which he was subjected to plus the stress of an affair of that kind on that particular day, I think could have been causative and the precipitating factor that led to his acute massive coronary and demise.

The employer argues that the above answer was equivocal, and that therefore claimant did not meet her burden.

However, the above statement must be read as part of Dr. Steinberg's entire testimony, a careful review of which convinces us that it was his unequivocal medical opinion that the decedent's heart attack arose in and was related to the course of employment. The doctor's detailed discussion displays a steadfast conviction as to the existence of that causal relationship.[1]

---

[1] A significant passage in Dr. Steinberg's testimony was as follows:

Q: Did you reach any conclusion clinically?

A: On the basis of this type of vessel that under various conditions of stress such as exertion, tension and anxiety and so forth that these vessels which already have a naraglumen (sic), can go into spasm and become narrow to the point there is no blood passing through and therefore, causes ischemia of that section of the heart that the blood vessels supply.

Q: What is ischemia?

A: Ischemia means lack of blood to the area. If the ischemia is maintained sufficiently, this leads to infarction

Therefore, the decision by the referee and the Board to grant claimant benefits was proper, and we affirm the order of the Board.

ORDER

AND Now, this 13th day of August, 1979, the order of the Workmen's Compensation Appeal Board, docket No. A-73536, dated February 1, 1978, is affirmed, and it is ordered that judgment be entered against em-

and scarring of the myocardium. Ischemia, i-s-c-h-e-m-i-a, this means a lack of blood supply and the three cardinal etiological factors in this type of situation are usually tension and anxiety, exertion and on a setting of pre-existing arteriosclerotic cardiovascular diseases.

Q: You saw him on—oh, incidentally, that is on this basis that you concluded there was a relationship between the two?

A: Yes.

Q: That is between the employment and the myocardial death?

A: His duties, right.

Q: You saw him on the 28th of December, three days before his death?

A: Right.

Q: What, if any significance was there to his situation then as related to the death on the 31st?

A: Well, he told me at that time that he was planning to work New Years Eve and he told me where he was planning to work. I told him that I thought his condition was too brittle for him to undertake an exertional type of thing that he was anticipating doing.

Q: When you use the term 'brittle', what do you mean?

A: I mean his coronary vessels were, as I indicated before and that he did not have a good myocardium, nor did he have good coronary vessels and with that background, exertion and stress of a New Year's Eve party in a restaurant, and the heavy lifting and so forth, seemed to me detrimental and I asked him not to take the job and I was under the impression that he wouldn't.

Q: What?

A: I was under the impression that he wasn't going to.

ployer Martinique and in favor of claimant, Julie Girardi, for compensation in the amount of $94.00 per week from January 1, 1973 for the duration of claimant's widowhood, together with interest at the rate of 10% per annum on all deferred payments of compensation due claimant; and for reimbursement in the statutory amount of $750.00 for the burial expense of her husband, together with interest thereon from the date of the filing of the fatal claim petition on June 6, 1973; as well as reimbursement to claimant for the cost of her expert medical witness upon deposition in amount of $290.30.